ATLANTIC RICHFIELD COMPANY
and B & A Pipe Line Company,
Appellants,

v.

The LONG TRUSTS, Appellees.

The LONG TRUSTS, Appellants,

v.

ATLANTIC RICHFIELD COMPANY
and B & A Pipe Line Company,
Appellees.

Nos. 6–92–025–CV, 6–92–120–CV.

Court of Appeals of Texas,
Texarkana.

April 27, 1993.

Opinion Overruling Motion for
Rehearing June 15, 1993.

F. Franklin Honea, Payne & Vendig, Dallas, Mike A. Hatchell, Ramey & Flock, Tyler, for appellant.

Rex A. Nichols, Law Offices of Rex A. Nichols, P.C., Longview, Bryant Boren, Jr., Baker & Botts, Dallas, for appellees ARCO and B & A Pipe Line Co.

C. Clint Adams, Dallas, for appellee Enserch Corp.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

## OPINION

GRANT, Justice.

The Long Trusts [1] appeal from their judgment against Atlantic Richfield Company (ARCO) and B & A Pipe Line Company, contending that the jury should have awarded them $6,327,693 as proven by conclusive evidence. ARCO and B & A also appeal from the judgment, contending that the court erred in awarding The Long Trusts $1,000,000 in damages, interest on that amount, and attorney's fees. ARCO also appeals the failure of the jury to award it any money for drilling costs. [2]

## BACKGROUND

Henderson Clay Products (HCP)—ARCO's predecessor—and The Long Trusts drilled gas wells during the early 1980s. The wells became producers, and HCP created B & A Pipe Line Company as its wholly owned subsidiary to build and maintain the pipe line and facilities transporting the gas to purchasers. On May 10, 1982, HCP and B & A entered into a contract whereby HCP dedicated its gas to B & A at the "applicable maximum lawful price per MMBTU [One Million British Thermal Units] as provided by the Federal Energy Regulatory Commission." [3] On May 11, 1982, B & A entered into a ten-year contract with Lone Star Gas in which B & A dedicated its gas to Lone Star, to be purchased at the price that B & A had agreed to pay HCP. Lone Star also agreed to pay B & A an operations fee on all volumes of gas delivered by B & A at the point of delivery, in addition to the gas cost. ARCO purchased HCP and stands in its position for all purposes.

ARCO (as successor of HCP) was operating under joint operating agreements with The Long Trusts and other investors. Section VI.C of each agreement stated that:

> In the event any party shall fail to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the oil and gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such oil and gas or sell it to others at any time and from time to time, for the account of the non-taking party *at the best price obtainable in the area for such production.* Any such purchase or sale by Operator shall be subject always to the right of the owner of the production to exercise at any time its right to take in kind, or separately dispose of, its

1. *The Long Trusts consist of Larry T. Long, Sammy Adamson, and Allan Long in their capacities as trustees for the Lawrence Allan Long trust, the Charles Edward Long trust, the Larry Thomas Long trust, and the John Steven Long trust.*

2. There were two separate appeals in this case, one by The Long Trusts and one by ARCO and B

& A. Both of these appeals arose from the same cause, tried as one case in district court and, for that reason, we are addressing both appeals in one opinion.

3. The price was about $6.00 per MMBTU at that time.

share of all oil and gas not previously delivered to a purchaser.

(Emphasis added.)

The Long Trusts contend that they were defrauded by ARCO because the phrase "best price obtainable in the area for such production" mandated that B & A keep in effect the right to receive the "maximum lawful price" for the gas delivered under the terms of the May 10, 1982, contract between HCP and B & A. They argue that subsequent amendments to the initial contract between ARCO and B & A and between B & A and Lone Star Gas defrauded them by lowering the gas price.

Those amendments were made as part of the settlement of a take-and-pay lawsuit between B & A and Lone Star Gas. The original contract between B & A and Lone Star was negotiated and signed at a time when natural gas prices were at their zenith. Very shortly thereafter, the prices began to drop drastically,[4] and Lone Star Gas failed to take the quantities of gas to which they had agreed under the contract or pay at the high price specified by the contract. B & A filed suit on the contract. The settlement of the suit provided that Lone Star Gas would agree to take substantially higher quantities of gas at a new, lower price. Even with the reduction in the purchase price, the price remained substantially above the going price for gas on the spot market.

### THE LONG TRUSTS' APPEAL

The primary issue: By modifying its long-term contract with Lone Star so that Lone Star paid less for the gas purchased, did ARCO—through its wholly-owned subsidiary B & A—violate the portion of its joint operating agreements with The Long Trusts stating that if ARCO sold The Long Trusts' gas, it would do so "at the best price obtainable in the area for such production?" We find that it did not.

### DETERMINATION

■ The Long Trusts focus on the portion of the previously quoted Article VI.C of the

joint operating agreements stating that the operator could sell their gas but only for the "best price obtainable in the area *for such production.*" To prevail, their argument must necessarily be that the best price available was the "maximum lawful price" that was contained in the original contract between B & A and Lone Star. They must also be able to show that they had some right to obtain that price under the agreements. Although The Long Trusts had benefited incidentally from the terms of that contract, they were not third-party beneficiaries of the contract, i.e., there was no showing that these contracts were entered into for the purpose of directly benefiting The Long Trusts. ARCO and B & A had committed its production to Lone Star over a ten-year period in order to obtain that premium price. On the other hand, The Long Trusts had a right to terminate ARCO's selling of its gas at any time. Neither B & A nor ARCO had any future obligations to The Long Trusts because, by the terms of the contract, these transactions could be terminated at any time by either party.

The phrase "best price obtainable in the area for such production" necessarily requires that the gas prices available be compared only to similarly uncommitted production and not to gas committed to a long-term sales contract. If The Long Trusts had wished to obtain a higher price over a longer period of time, it had the option of negotiating separately with any gas purchaser. The joint operating agreements did not require that ARCO sell gas on behalf of The Long Trusts or that The Long Trusts must allow ARCO to sell their gas. Rather, the agreements provided that ARCO or The Long Trusts could terminate the selling of the gas at any time. This agreement cannot be rewritten by judicial fiat to say that ARCO's option had abruptly become ARCO's duty. So long as ARCO continued to sell for The Long Trusts, The Long Trusts enjoyed the same benefits that ARCO had obtained for itself.

The Long Trusts could not prevent ARCO from renegotiating its contracts to sell its

---

4. Between 1982 and the time of the settlement, gas prices had generally dropped from approximately $6.00 per MMBTU to less than one third of that level.

own gas and had no vested interest in these contracts. In claiming such an interest, The Long Trusts seek to enjoy all the benefits of contracts to which they were not parties and at the same time bear none of the obligations of the terms of the contracts. The Long Trusts could have entered into their own long-term contract at the best price they could obtain, and B & A would have been required to transport their gas at a reasonable transportation fee. The term "for such production" in the joint operating agreements meant the undedicated gas of The Long Trusts. The term applied to what could be obtained for such undedicated gas or what actually was obtained. The Long Trusts were not entitled to any damages as a result of B & A's amendments to its contracts with Lone Star or with ARCO.

The trial court did not err in refusing to award The Long Trusts damages of $6,327,693.

## ARCO AND B & A'S APPEAL

The issues: ARCO and B & A appeal on the ground that the contract upon which the damages were based did not provide a basis for any recovery by The Long Trusts on the facts proven in this case. ARCO and B & A also contend that the trial court erred by failing to disregard certain jury answers because they were entitled to judgment as a matter of law, by failing to direct a verdict because there was no evidence on certain issues submitted to the jury, by submitting erroneous questions to the jury, by failing to submit a proximate cause question on the alleged conspiracy, by failing to hold that The Long Trusts cannot benefit because of their own breach, by permitting The Long Trusts' witnesses whose names were not furnished as requested in interrogatories to testify, and by failing to award ARCO attorney's fees in conjunction with its cross-action on drilling costs.

## FAILING TO ACCOUNT

■ We first examine the determination that ARCO failed to account to The Long Trusts at the best prices obtainable in the

area for such production by not accounting to them for their share of the production at the price set forth in the B & A amendment [5] for gas marketed from June 1, 1985, to January 31, 1991. This examination includes the contentions by ARCO and B & A that the trial court erred in failing to disregard certain jury answers and in failing to direct a verdict because there was no evidence on certain issues submitted to the jury. ARCO and B & A also urge that they are entitled to judgment on the evidence as a matter of law. Because they did not have the burden of proof on these issues, the correct standard for reviewing the evidence is to apply a no evidence standard. *See Sterner v. Marathon Oil Co.*, 767 S.W.2d 686 (Tex.1989).

■ In reviewing no evidence points, the court considers only the evidence tending to support the finding, viewing it in the light most favorable to the finding, giving effect to all reasonable inferences therefrom, and disregarding all contrary and conflicting evidence. *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400 (Tex.1981).

Nothing in the joint operating agreements prohibited ARCO or B & A from becoming the purchaser of the gas, if The Long Trusts were willing to sell the gas to ARCO or B & A. The operating agreements, however, did not contemplate that ARCO could become both the seller and the purchaser or that ARCO could make a profit directly or indirectly from selling the gas of The Long Trusts.

By the terms of the operating agreements, The Long Trusts expressly authorized ARCO to sell its gas at a controlled price, being the "best price obtainable in the area for such production." This creates a special agency limited to the sale of The Long Trusts' gas from the wells involved.

■ We recognize that the Texas Supreme Court has determined that, unless a lease document itself creates a trust, the relationship between the operator and the royalty owners is based upon an implied covenant and that the operator owes the

---

5. The B & A amendment was defined in the jury charge as the "agreement between B & A Pipe-line Company and Lone Star Gas dated effective February 1, 1986."

royalty owners a duty of good faith. *Amoco Production Co. v. Alexander,* 622 S.W.2d 563 (Tex.1981); *Amoco Production Co. v. First Baptist Church of Pyote,* 611 S.W.2d 610 (Tex.1980). A lessee, however, is not an agent with respect to the sale of the lessor's gas *because the lessor has no gas to sell.* An oil and gas lease conveys to the lessee title to the gas in place, subject only to the contractual obligation to pay royalty on gas that is produced. *Hurd Enterprises, Ltd. v. Bruni,* 828 S.W.2d 101, 109 (Tex.App.—San Antonio 1992, writ denied).

The present case does not concern royalty owners, and an agency relationship does arise when an operator is selling gas belonging to a nonoperator. *See Johnston v. American Cometra, Inc.,* 837 S.W.2d 711 (Tex.App.—Austin 1992, writ denied). The act of selling on behalf of the nonoperator, unlike a direct purchase of the nonoperator's share of production, implies a principal-agent relationship. *See* Ernest E. Smith, *Gas Marketing by Co–Owners: Disproportionate Sales, Gas Imbalances and Lessors' Claims to Royalty,* 39 BAYLOR L.REV.S *365, 373* (SPRING 1987).

ARCO correctly contends that it was not receiving any remuneration from The Long Trusts for selling its gas; however, a gratuitous agent is subject to the same duty to account as a paid agent.[6] Whether the relationship can be described as one of agency or trust, there is a duty owed to The Long Trusts to account for the monies received for selling its gas, to avoid conflicts of interests,[7] and not to act as an adverse party [8] in its capacity as the seller of its gas.

The jury, having found that ARCO was the alter ego of B & A, and B & A being the wholly owned subsidiary of ARCO, then The Long Trusts were entitled to damages for any profit from the sale of the gas by B & A.[9] Whether ARCO was selling the gas as

an accommodation to The Long Trusts or was selling it to recoup the drilling costs owed by The Long Trusts, the gas was sold under the authority of the operating agreements. Because B & A was found to be the alter ego of ARCO, B & A's selling of gas to Lone Star for profit was tantamount to ARCO selling it to Lone Star for profit and not properly accounting to The Long Trusts for that profit. There was expert testimony that B & A received $2.90 per MMBTU for gas belonging to The Long Trusts that had been sold by ARCO to B & A for prices of $1.60 and $1.40 per MMBTU. An expert established that The Long Trusts lost more than one million dollars because ARCO did not account to it for the price at which the gas was sold by B & A.

We find that the operating agreements provide a basis for recovery for The Long Trusts on the facts proven in this case, that the trial court did not err in failing to disregard the jury answers and in failing to direct a verdict because there was some evidence on the essential jury findings that supported the judgment. These points of error are overruled.

## ALTER EGO

The foregoing conclusion assumes the correctness of the jury's finding that B & A was the alter ego of ARCO. Because that was a necessary step in our conclusion, we must examine ARCO's attacks on the jury's alter ego finding to determine if our conclusion can stand. ARCO contends that the trial court erred by submitting an issue on alter ego to the jury (1) because the instruction contains the wrong elements, and (2) because the doctrine does not apply to this case as a matter of law.

ARCO and B & A contend that the trial court erred by not using the statutory definition of *alter ego.* The statute, however, does not undertake to define alter ego; rather, it

6. *See* RESTATEMENT (SECOND) OF AGENCY § 379 (1958).

7. *See* RESTATEMENT (SECOND) OF AGENCY § 394 (1958).

8. *See* RESTATEMENT (SECOND) OF AGENCY § 389 (1958).

9. B & A would not be prohibited from making a reasonable charge for transmitting the gas through its pipeline, and there has been no challenge of the amounts charged by B & A for such transmission.

sets forth specific situations in which the stockholders may not be held liable under any doctrine for disregarding the corporate entity. *See Matthews Construction Co. v. Rosen*, 796 S.W.2d 692 (Tex.1990).

Although B & A and ARCO objected to the definition of alter ego, they did not offer any proposed definition or specify in what manner the proposed definition was incorrect.[10] When a party is complaining about a definition, that party must point out distinctly the objectionable matter and grounds of the objection. TEX.R.CIV.P. 274. By failing to inform the court adequately of the alleged error, ARCO and B & A have failed to preserve any error concerning the trial court's definition of alter ego. TEX. R.APP.P. 52(a).

By their objection, B & A and ARCO did preserve their contention that the concept of alter ego was not appropriate in a breach of contract case. They argue that, because the present case is a breach of contract case, TEX.BUS.CORP.ACT ANN. art. 2.21(A)(2) (Vernon Supp.1993),[11] supplants the common law doctrine of alter ego and prohibits its application in this case.

Article 2.21(A)(2) pertains only to a situation in which a creditor is attempting to hold stockholders liable for corporate debts. That is not the situation before this Court. The Long Trusts are not attempting to make ARCO liable as stockholders of B & A for a contractual indebtedness of B & A. Instead, The Long Trusts are attempting to make ARCO liable under a duty created by its own contractual agreements with The Long Trusts whereby ARCO undertook to sell the gas of the The Long Trusts. There is nothing in Article 2.21 which would suggest that it eliminates the alter ego concept when applied to situations not specifically covered in the Article.

Furthermore, even if Article 2.21(A)(2) applied in this case, a showing of actual fraud permits the finding of alter ego under that Article. We agree with the court's holding in *Farr v. Sun World Savings Ass'n*, that when actual fraud for the benefit of the perpetrating shareholder can be shown, the various doctrines for disregarding the corporate entity, including alter ego and a sham to perpetuate a fraud, are still very much alive. *Farr v. Sun World Savings Ass'n*, 810 S.W.2d 294, 296 (Tex.App.—El Paso 1991, no writ). The record in the present case indicates that ARCO reaped large dividends from B & A by using B & A, its wholly owned subsidiary as the purchaser of gas that ARCO was selling for The Long Trusts. The jury found that ARCO's failure to account properly to The Long Trusts was intentional and that ARCO utilized B & A as a sham to perpetrate a fraud on The Long Trusts. This constitutes a finding of actual fraud upon which the piercing of the corporate veil is authorized. These points of error are overruled.

ARCO also argues that the jury's answer to Question 4 finding that B & A was the alter ego of ARCO should be disregarded because there was no liability question tied to the finding. However, the answer to this

---

10. The objections by ARCO & B & A were as follows:

> Looking at Page 7 of the Court's Charge, with respect to the definition of alter ego, B & A and ARCO object to the definition of alter ego on the ground that such definition is not appropriate in a breach of contract case. B & A Pipe Line Company states and ARCO states that in a breach of contract case, which this is, that only the statutory grounds for avoiding the corporate identity are permitted in the Texas Civil Practice and Remedies Code. B & A and ARCO further object to the definition of alter ego in that same has not been pled by B & A— excuse me, by the Long Trusts.

(The Texas Civil Practice and Remedies Code does not contain a definition of alter ego or any discussion of the subject.)

11. Art. 2.21. **Liability of Subscribers and Shareholders**

A. A holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted shall be under no obligation to the corporation or to its obligees with respect to:

. . . .

(2) any contractual obligation of the corporation on the basis of actual or *constructive fraud, or a sham* to perpetrate a fraud, *unless* the obligee demonstrates that the holder, owner, or subscriber *caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, owner, or subscriber.*

(Emphasis added.)

question became significant in the later question asking if a proper accounting had been made by ARCO on the basis of B & A's amended contract with Lone Star. The later question makes the legal significance of that relationship clear, and the jury's answer was a proper finding of fact. ARCO was using its subsidiary to make a profit on the sale of The Long Trusts' gas, which ARCO could not do itself. The jury followed up with a finding that ARCO used B & A as a sham to defraud The Long Trusts. These findings are tied to the issues on damages. These points of error are overruled.

### CONSPIRACY

ARCO and B & A challenge the jury's finding that they conspired to defraud The Long Trusts.[12] They contend that a conspiracy was not proven as a matter of law because a parent corporation cannot conspire with its wholly owned subsidiary.

█ The United States Supreme Court held that, for purposes of the Sherman (Antitrust) Act, it is not possible for a wholly owned subsidiary to conspire with its parent, since their interests were necessarily identical. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). The Fourteenth Court of Appeals in Houston ignored the antitrust distinctions and held as a matter of law that a parent corporation cannot conspire with its wholly owned subsidiary. However, we agree with the San Antonio court that *Copperweld* was restricted to the antitrust context and was not applicable to common law conspiracies. *Metropolitan Life Ins. Co. v. La Mansion Hotels*, 762 S.W.2d 646, 651–52 (Tex.App.—San Antonio 1988, writ dism'd as moot). Because this is not an antitrust case, we find that the trial court did not err by submitting this issue to the jury. Furthermore, the jury's findings on this issue were not necessary to establish liability in light of the jury's answers to the other jury questions. This point of error is overruled.

### JURY SUBMISSION

█ ARCO and B & A complain about the questions submitted to the jury, about the multiple submission of damage issues, and about the failure to submit a proximate cause question on the alleged conspiracy. As discussed above, the conspiracy finding was not necessary to the award of judgment. The Long Trusts' suit was based upon alternate theories. Our ruling interpreting the language of the operating agreements eliminates the need for a jury question on one of the theories. Even though the multiple submission of the damage issue was unnecessary, the trial court correctly entered a judgment based upon only one of the three findings of damages. We have reviewed the questions submitted and the entire charge, and we find that any error in submission was not of such a nature that it caused or was reasonably calculated to cause the rendition of an improper judgment.

### FIRST INTO THE BREACH

█ ARCO next contends that, since The Long Trusts admit breaching the joint operating agreements, The Long Trusts may not now seek to enforce the terms of those agreements. ARCO argues that The Long Trusts are thus unable to recover for any breach by ARCO as a matter of law. ARCO cites several cases for this proposition that are typified by *Joseph v. PPG Industries, Inc.*, 674 S.W.2d 862, 867 (Tex.App.—Austin 1984, writ ref'd n.r.e.). In *Joseph*, the court stated that "one who has himself broken a contract cannot recover on it." However, when read in context, this would more accurately be rendered: When a party to the contract fails to perform his obligation, he may not thereafter enforce the remaining terms of the contract.

█ A closer parallel is found in *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685 (Tex.1981). In that case, a party failed to finish paying for a business that he was purchasing but nevertheless attempted to enforce a noncompetition clause of the contract. The court held that a party in default is not relieved by a subsequent breach by the other party and that the default by one party excuses performance by the other party. These cases suggest that the second party to

---

12. The jury found that Lone Star did not participate in any conspiracy.

breach a contract can still maintain a breach of contract suit against the first to breach for the initial breach. The Long Trusts' suit was based upon an initial breach by ARCO failing to account properly for income. The later breach by The Long Trusts did not bar recovery on an earlier fraudulent violation of the agreements, and recovery was possible under the terms of these agreements. *See Hanks v. GAB Business Services, Inc.,* 644 S.W.2d 707 (Tex.1982).

## WITNESSES

ARCO contends that the trial court erred by allowing The Long Trusts' witnesses to testify despite the fact that they were not named in answer to ARCO's interrogatories. The Long Trusts admit that they did not answer this particular set of interrogatories, but at a pretrial hearing, the judge decided that The Long Trusts had demonstrated good cause for permitting most of the witnesses to testify.

Shortly before the case was removed to state court, ARCO filed interrogatories in federal court asking The Long Trusts to identify their fact and expert witnesses. The Long Trusts never answered these interrogatories. The Long Trusts then proceeded to trial (over objection) with fourteen witnesses.

Suit was initially filed in state court on July 6, 1988, and was removed to federal court in August 1988. The Long Trusts did furnish two lists designating witnesses, one on August 7, 1989, and one on June 1, 1990, before the case was removed back to the state court. On July 25, 1991, The Long Trusts furnished a list of expert witnesses, but this was not in response to an interrogatory. On March 4, 1991, The Long Trusts furnished a list of witnesses in answer to interrogatories propounded by Enserch (Lone Star Gas). The Long Trusts sent a copy of this list of witnesses to ARCO along with a cover letter (addressed specifically to ARCO) expressing an intent to call these witnesses.

On July 25, 1991, The Long Trusts supplemented its answers to Enserch's interrogatories by naming additional witnesses. On March 1, 1991, The Long Trusts sent answers to ARCO's interrogatories in a companion federal case naming the same witnesses. On March 19, 1991, The Long Trusts sent a second supplemental list of answers to ARCO's interrogatories in the companion federal case, again listing witnesses. All of the witnesses had been deposed except for Brass, Honea, and Hart. This information is shown on the chart below:

### WITNESSES WHO TESTIFIED IN PERSON OR BY DEPOSITION

|  | FED1 | FED2 | STLIST | ENSRCHINT | ENSUPP | TSA | TSA2 |
|---|---|---|---|---|---|---|---|
| Mike Wilhite (deposed) |  |  |  |  |  |  |  |
| Mike Mitchell (deposed) |  |  |  |  | listed | listed |  |
| Troy Nunnery (deposed) |  |  |  |  | listed | listed |  |
| Kenneth Williams (deposed) |  |  |  |  |  |  |  |
| Howard Roach (deposed) |  |  |  |  |  |  |  |
| Vanell Lee (deposed) |  |  |  |  |  |  |  |
| David Brass |  |  | listed | listed | listed |  |  |
| Neal Hawthorn (deposed) | listed | listed | listed | listed | listed | listed | listed |
| Newton Ballou (deposed) | listed | listed | listed | listed | listed | listed | listed |
| Allan Long (deposed) |  | listed | listed | listed | listed | listed | listed |
| Larry Long (deposed) |  | listed | listed | listed | listed | listed | listed |
| Franklin Honea atty |  |  |  | listed | listed | listed | listed |
| David Bercot atty (deposed) |  |  | listed |  |  |  |  |
| Jeff Hart atty |  |  | listed |  |  |  |  |

*FED1:* August 7, 1989 list designating Experts(Before removal back to State Court)
*FED2:* June 1, 1990 list designating witnesses(Before removal back to State Court)
*STLIST:* July 25, 1991 List Designating Experts(Not in response to interrogatory)
*ENSRCHINT:* March 4, 1991, Trusts answers to Enserch Interrogatories—explicit copy to ARCO—also names all those deposed in both actions as fact witnesses)
*ENSUPP:* July 25, 1991, Trusts *Supp.* answers to Enserch Interrogatories naming witnesses.
*TSA:* March 1, 1991, Trusts Supp Answers to ARCO interrogatories in a companion federal case, naming witnesses
*TSA2:* March 19, 1991, Trusts 2d Supp Answers to ARCO interrogatories in companion federal Case, naming witnesses

Two of the witnesses that The Long Trusts attempted to call were not allowed to testify by the trial court. The two excluded witnesses (Hageman, Towns) were named as experts in the "Designation of Experts" filed July 25, but were excluded because The Long Trusts could not show the court any documents informing any party of the substance of their expected testimony. Four of the witnesses, Mike Wilhite, Kenneth Williams, Howard Roach, and Vanell Lee, do not appear on any of the lists of witnesses, but they had been deposed.

■ The general rule is that a party has an affirmative duty to identify expert witnesses in response to an *appropriate inquiry*. The sanction for failing to comply with this rule is the automatic exclusion of the unidentified witness's testimony. TEX. R.CIV.P. 166b(2)(d), (e); *Sharp v. Broadway Nat. Bank*, 784 S.W.2d 669, 671 (Tex.1990); *First Interstate Bank v. Bland*, 810 S.W.2d 277 (Tex.App.—Fort Worth 1991, no writ).

The Long Trusts contend that the documents filed while the cause was in federal court were a nullity because that court was determined to have no jurisdiction of the case. ARCO argues that the interrogatories filed in federal court are an integral part of the action and that The Long Trusts' failure to answer them should have prevented their use of the witnesses. In support of this assertion, they cite a single case, *Ayres v. Wiswall*, 112 U.S. 187, 5 S.Ct. 90, 28 L.Ed. 693 (1884). In *Ayres*, a case had been improperly removed to federal court from the state court and was remanded to the state court. The Supreme Court held that the state court should determine what should be done with pleadings filed and testimony taken during the pendency of the suit in the other jurisdiction.

■ In the present case, although pretrial discovery could not be classified as pleadings, the trial court to which the case had been returned from federal court should have determined what effect to give to unresolved and answered discovery motions filed while the case was in federal court. In effect, the trial court made that determination in the present case by allowing some of the witnesses to testify. The trial court also had discretion to allow the witnesses to testify on the basis of a showing of good cause. A determination of good cause can only be set aside if the trial court abused its discretion. *Smithson v. Cessna Aircraft Co.*, 665 S.W.2d 439, 442 (Tex.1984). To determine if there has been an abuse of discretion, this Court must determine whether the trial court acted without reference to any guiding principles and rules. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985).

Under the circumstances set forth above, we find that the court did not abuse its discretion in finding good cause and allowing the testimony. These points of error are overruled.

## ATTORNEY'S FEES

■ ARCO also argues that it is entitled to recover its attorney's fees because it won that portion of the lawsuit involving drilling costs, citing TEX.CIV.PRAC. & REM. CODE ANN. § 38.001 (Vernon 1986). When a prevailing party in a breach of contract suit seeks attorney's fees under Section 38.001, makes its proof, and meets the requirements of the section, an award of attorney's fees is mandatory. *Arguelles v. Kaplan*, 736 S.W.2d 782, 786 (Tex.App.—Corpus Christi 1987, writ ref'd n.r.e.); *Caldwell & Hurst v. Myers*, 714 S.W.2d 63, 65 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.). The fees are recoverable under Section 38.001 even if the amount is entirely offset by the opposing party's claim. *McKinley v. Drozd*, 685 S.W.2d 7, 10 (Tex.1985).

■ In addition, Section I.3 of the accounting procedures contained within the joint operating agreements also entitled ARCO to recover attorney's fees in the event of an investor refusing to pay its proportion of the bills in a timely fashion.[13] Therefore,

13. The operating agreement in Section I.3 provides as follows:

Each Non–Operator shall pay its proportion of all bills within fifteen (15) days after receipt. If payment is not made within such time, the

there are two separate provisions, each of which mandates the recovery of attorney's fees in the event of a breach of contract. The contractual term would control if it provided a particular recovery calculation for such fees. *Beltran v. Groos Bank, N.A.*, 755 S.W.2d 944 (Tex.App.—San Antonio 1988, no writ). This contract provides no specifics.

ARCO contends that the uncontroverted evidence conclusively shows that more than $1.5 million was recoverable by ARCO against The Long Trusts from the time the wells were drilled to the date of trial. ARCO contends that because this amount is more than the $1 million awarded to The Long Trusts, ARCO was entitled to recover attorney's fees. The Texas Supreme Court did away with the requirement of a net recovery concept in *McKinley v. Drozd*, 685 S.W.2d 7.

ARCO contends that it was owed $119,758.46 on the drilling costs after deducting the money it had recouped from the sale of gas belonging to The Long Trusts. The jury found zero dollars was owed to ARCO for the drilling costs.[14]

■ When a party prevails and establishes a valid claim, the party can be entitled to attorney's fees without achieving a monetary recovery on the claim itself. *Martini v. Tatum*, 776 S.W.2d 666, 670 (Tex.App.—Amarillo 1989, writ denied). The jury's finding of zero damages does not preclude the awarding of attorney's fees when the party has prevailed under the terms of the contract. *De La Rosa v. Kaples*, 812 S.W.2d 432 (Tex.App.—San Antonio 1991, writ denied).

The record clearly shows that ARCO prevailed on the drilling costs issue. The jury found that The Long Trusts had breached the joint operating agreements by failing to

pay ARCO in accordance with those agreements. The undisputed evidence showed that The Long Trusts had not paid their share of the drilling costs under the terms of the joint operating agreements. The Long Trusts had taken the position that they had been overcharged on the tubular goods used in the drilling process and in the amount of interest charged for failing to pay their share of the drilling costs. ARCO prevailed on both of these issues: The jury found that ARCO had not breached the contract by failing to price the tubular goods in accordance with the terms of the joint operating agreements and that ARCO had not improperly billed interest to The Long Trusts on these accounts. During the pendency of the suit, ARCO was able to recoup most of the drilling costs by applying the proceeds from the sale of The Long Trusts' share of the gas produced to the drilling costs. The amount of drilling costs and the amounts that had been applied to the drilling costs were undisputed. Thus, ARCO is entitled to attorney's fees based upon the litigation of this portion of the suit.

■ ARCO contends that its evidence on attorney's fees conclusively establishes the amount owed and, therefore, this appellate court should render in accordance with that evidence. We believe, however, that the question of reasonableness of attorney's fees is generally a question for the factfinder. We find that the trial court erred in failing to award attorney's fees, but we believe that this Court would be exercising original rather than appellate jurisdiction if we attempted to establish the proper amount of reasonable attorney's fees. *See International Security Life Ins. Co. v. Spray*, 468 S.W.2d 347, 349 (Tex.1971). An appellate court should not

---

unpaid balance shall bear interest monthly at the rate of twelve percent (12%) per annum or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts.

14. ARCO states in its point of error that the trial court erred in failing to disregard the zero finding to the damage issue. Except for a footnote, all the argument and discussion under this point of error mentions the zero finding of damages

only in light of entitlement to attorney's fees. The entire discussion is devoted to attorney's fees. Because ARCO had the burden of proof on damages, a motion to disregard, standing alone, would have been insufficient for the reason that if the trial court had disregarded the answer to this issue, this would still leave no finding as to damages or the amount owed by The Long Trusts on drilling costs. If the motion to disregard had been sustained, this amount would have been required to be established as a matter of law or retried.

usurp the factfinding function of the trial court.[15] *Industrial Disposal Supply Co. v. Perryman Bros. Trash Service*, 664 S.W.2d 756, 760–61 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.); *Behring International v. Greater Houston Bank*, 662 S.W.2d 642, 652 (Tex.App.—Houston [1st Dist.] 1983, writ dism'd); *Harry Hines Medical Center, Ltd. v. Wilson*, 656 S.W.2d 598, 603 (Tex.App.—Dallas 1983, no writ); *see also* WILLIAM V. DORSANEO, 1A TEXAS LITIGATION GUIDE § 22.52 (1993). This point of error is sustained, and this matter will be remanded to the trial court for a determination of the amount of reasonable attorney's fees in connection with the litigation on drilling costs.

The judgment of the trial court is affirmed on all matters except its failure to award reasonable attorney's fees to ARCO for its suit on the drilling costs. The determination of the amount of reasonable attorney's fees for ARCO is severed and remanded to the trial court for a determination thereof.

## OPINION ON MOTION FOR REHEARING

On rehearing, The Long Trusts complain that their real cause of action was not addressed in our original opinion because their complaint was not about the contract amendments between B & A and Lone Star, but rather was about the contract amendment between B & A and ARCO.

There were three jury issues submitted on damages.[16] Jury Question 3 asked the jury the amount of damages on a broader basis than the other two special issues, that being ARCO's failure to account at the best price available in the area for this type of production. Because of the jury's finding on alter ego, The Long Trusts are entitled to have this transaction looked at both on the basis of treating B & A as a separate entity from ARCO and as one and the same entity as ARCO. As we discussed in our initial opinion, The Long Trusts had no vested interest in the contracts made by ARCO committing gas to long-term sales to third party entities, because The Long Trusts did not commit its gas to ARCO. Thus, if B & A is treated as a third party entity, no liability would result from the amendments of the contracts between ARCO and B & A.

We must next look at the transactions on the basis that B & A was functioning as the alter ego of ARCO. The initial agreements were pass-through contracts under which ARCO was selling its gas to B & A at the same price that B & A was receiving from Lone Star, with B & A also receiving a fee for transporting the gas. When B & A is viewed not as a separate entity but merely as an extension of ARCO, then the relevant price was the price that Lone Star paid for the gas. If the amendments to this contract had continued the contract as a pass-through contract, then The Long Trusts would not have been entitled to any damages because, in essence, ARCO was the seller to Lone Star. The amended contract, however, allowed B & A to make a profit, which we have concluded amounted to ARCO making a profit to which it was not entitled under the terms of its operating agreements with The Long Trusts. For this unauthorized profit, we have upheld the damage award.

We overrule the motion for rehearing.

**15.** At least one court has determined that it could reverse and render attorney's fees that have been conclusively proven. *Gunter v. Bailey*, 808 S.W.2d 163–66 (Tex.App.—El Paso 1991, no writ).

**16.** Jury Question 6 inquired of damages caused by ARCO in failing to account for the best price obtainable under the amended contract between B & A and Lone Star. It was on the basis of the jury's answer to this question that the court upheld the judgment of the trial court. Jury Question 8 asked about damages on the basis of ARCO's failure to account in regard to the amended contract between ARCO and B & A.