# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00823-CV

**Appellant, Metal Building Components, LP// Cross-Appellants, Cecil D. Scott, Individually, and Armor Products, Inc.**

**v.**

**Appellees, Wayland Raley; Cecil D. Scott, Individually; Armor Products, Inc.; and Armor Real Estate Corporation// Cross-Appellee, Metal Building Components, LP**

---

**FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 277TH JUDICIAL DISTRICT NO. 04-402-C277, HONORABLE KEN ANDERSON, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

This appeal concerns a matter of default on a line of credit account. Appellant/Cross-Appellee Metal Building Components, LP ("MBCI"), intervened in the trial court proceedings seeking payment of a $61,026.39 debt on a line of credit account held by Jason Rhodes in the name of CDS Erectors, Inc. MBCI also sought to invalidate property transfers from CDS Erectors & Rigging, Inc., to Armor Products, Inc., and from Armor Products, Inc., to Armor Real Estate Corporation under the Uniform Fraudulent Transfer Act.[1] After a bench trial, the trial court granted judgment in favor of MBCI, finding appellees/cross-appellants Cecil Scott, one of the shareholders of CDS Erectors & Rigging, Inc., and Armor Products, Inc., jointly and severally liable for the debt to MBCI. In addition, the trial court held that the property transfer from CDS Erectors & Rigging,

---

[1] Tex. Bus. & Com. Code Ann. §§ 24.001-.013 (West 2002 & Supp. 2006) ("UFTA").

Inc., to Armor Products, Inc., violated the UFTA, but the transfer from Armor Products, Inc., to Armor Real Estate Corporation did not. The trial court also granted judgment for attorney's fees to MBCI as the prevailing party. For the reasons discussed below, we affirm the judgment in part, and we reverse in part and remand this cause to the trial court for further proceedings.

## FACTS AND PROCEDURAL BACKGROUND

Wayland Raley filed suit against Cecil Scott, individually, and Armor Products, Inc., to obtain money damages for a personal injury suffered during his employment at Armor Feed & Supply, Inc.[2] As a party with a justiciable interest in the Raley lawsuit, MBCI intervened in the proceedings seeking payment for a credit account in default held by Jason Rhodes in the name of CDS Erectors, Inc. In this suit, MBCI filed claims against Scott, individually, as well as Armor Products, Inc., and Armor Real Estate Corporation. In its first amended petition in intervention, MBCI asserted claims of fraudulent transfer and "disregarding corporate fiction." Because Raley settled his claims against Scott and Armor Products prior to trial, the only trial participants were MBCI, Scott, Armor Products, and Armor Real Estate.[3]

### The Original Debt

MBCI is a manufacturer of metal building and roofing components. In May 2000,

---

[2] Raley had previously obtained a judgment against Patricia Scott d/b/a Armor Farm and Ranch Supply in the amount of $52,614.75. By this suit, Raley sought to impose joint and several liability against Cecil Scott and Armor Products for the judgment against Patricia Scott d/b/a Armor Farm and Ranch Supply on grounds of single business enterprise—a corporate veil-piercing theory. We note that the record reflects Patricia Scott is Cecil Scott's wife and Jason Rhodes's mother.

[3] Raley is not a party to this appeal.

2

Jason Rhodes contacted MBCI about obtaining a line of credit for purchases. Rhodes is the stepson of Cecil Scott, and he is identified as the vice president/secretary of CDS Erectors & Rigging in the franchise tax reports for 1998 to 2000 on file with the Texas Secretary of State and the Texas Comptroller.[4] These same franchise tax reports identify David Bailey as the president of CDS Erectors & Rigging.[5] Rhodes submitted a credit application to MBCI in the name of "CDS Erectors, Inc.," and signed the application in his capacity as vice president. Although Scott's signature as company president appears on this application, the parties dispute whether Scott actually signed the document or even had knowledge of the application. In any event, despite these discrepancies on the credit application, MBCI approved a credit line of $15,000 in the name of "CDS Erectors & Rigging, Inc.," on June 1, 2000.

From June 2000 to October 2001, Rhodes purchased materials, accepted deliveries from MBCI, and made payments[6] on the credit account without incident. Then, in October 2001, Rhodes contacted MBCI about increasing his line of credit to $60,000 to accommodate his purchases for the Powell Lane Project, a construction project located in Austin, Texas. MBCI approved the increased credit limit on the condition that Rhodes and the general contractor for the Powell Lane Project agree to sign a joint-check agreement requiring that MBCI be included as a joint payee on any checks issued by the general contractor to CDS Erectors & Rigging for work done on the Powell

---

[4] The articles of incorporation for CDS Erectors & Rigging on file with the secretary of state do not list Rhodes as either an officer, director, or shareholder.

[5] The record reflects that Bailey was married to Scott's sister, but divorced in 1985.

[6] All of these payments were drawn on a Wells Fargo checking account held by Rhodes in the name of "CDS Erectors."

3

Lane Project. Rhodes executed the joint-check agreement as "Vice President of CDS Erectors & Rigging, Inc.," and Rhodes had Marc Cook sign the agreement as "Vice President–Finance of Faulkner Construction Co." on behalf of the general contractor. Unbeknownst to MBCI at the time, however, Faulkner Construction Co. was not the general contractor for the Powell Lane Project, and Cook did not work for Faulkner Construction Co.

Although Rhodes continued to accept deliveries from MBCI, in November 2001, he failed to make payments on the MBCI account. As a result, in December 2001, MBCI began collection efforts. The record reflects that MBCI sent certified letters to both Rhodes and Scott in an effort to collect the $61,026.39 debt. Scott signed for the certified letter addressed to Rhodes on January 4, 2002, and Scott testified that he gave the certified letter to Rhodes.

Eventually, MBCI filed suit in Travis County district court against CDS Erectors & Rigging, Inc., Jason Rhodes, individually, Marc Cook, individually, and Commercial Indemnity Insurance Company, the surety company that issued the construction bond for the Powell Lane Project. *MBCI v. CDS Erectors & Rigging, Inc.*, No. GN203730 (200th Dist. Ct., Travis County, Tex. Sept. 25, 2003). By its suit, MBCI obtained a default judgment against CDS Erectors & Rigging, Inc. *Id.*[7] In addition, MBCI obtained a summary judgment against Rhodes and Commercial Indemnity Insurance Company, finding them jointly and severally liable for the debt. *Id.* Thereafter, Rhodes and the bonding company declared bankruptcy. The record reflects that

---

[7] The default judgment against CDS Erectors & Rigging was severed from the original cause to allow it to become final. *See MBCI v. CDS Erectors & Rigging, Inc.*, No. GN302559 (126th Dist. Ct., Travis County, Tex. July 21, 2003).

MBCI filed an adversary claim against Rhodes and that the bankruptcy court refused to discharge Rhodes's debt to MBCI.

In 2004, still seeking satisfaction of the debt it was owed, MBCI filed suit against Marc Cook, Mark McCandless, and Joe Petrocelli, individually, as well as the Powell Lane Plaza Partnership, and Austin Refrigeration, Inc. *MBCI v. Cook*, No. GN401001 (126th Dist. Ct., Travis County, Tex. Jan. 5, 2004). Through this suit, MBCI obtained a default judgment against Cook, McCandless, Petrocelli, and the Powell Lane Plaza Partnership. *Id*.

### The Property Transfers

CDS Erectors & Rigging, Inc., was a structural steel erection company that was incorporated by Scott in 1997. Scott, Bailey, and Bobby Utsey[8] were shareholders of CDS Erectors & Rigging, Inc. The record reflects that, during the summer of 2001, Scott underwent open-heart surgery and decided to sell his shares of CDS Erectors & Rigging to Bailey and Utsey. Scott, Bailey, and Utsey agreed to the terms of the sale in October 2001. Instead of continuing as CDS Erectors & Rigging, Bailey and Utsey formed a new company—Armor Products, Inc.[9] As required by the terms of the sale, Armor Products purchased the property owned by CDS Erectors & Rigging at 804 Rices Crossing in Taylor, Texas, for $45,000. In addition, Armor Products paid Scott $25,000 in cash, took over the $60,000 line of credit from Citizens State Bank, and agreed to lease any necessary equipment to continue their steel erection business. The sale from CDS Erectors &

---

[8] The record reflects that Bobby Utsey is Scott's cousin.

[9] Armor Products was incorporated by Utsey on December 18, 2001, with Bailey and Utsey as the only shareholders.

5

Rigging to Armor Products was finalized, and the property was transferred on December 31, 2001.

Then, in April 2002, Armor Products leased the property to Rhodes to open a feed store—Armor Farm and Ranch Supply. Later in 2002, Bailey and Utsey asked Scott to return to work and help them straighten out their receivables. Scott agreed, and he was appointed president of Armor Products in November 2002.

To obtain additional operating capital in 2003, Armor Products took out a $120,000 mortgage from Coupland State Bank secured by the property as collateral. Scott also agreed to personally guarantee the loan, and as a condition of the loan, Coupland State Bank sought and obtained a property appraisal. The Rices Crossing property was appraised at $150,000.

In the summer of 2004, Lester Westberg approached Rhodes about buying the feed store. Upon further negotiations, Westberg and Rhodes decided to go into business together and to purchase the Rices Crossing property from Armor Products. Accordingly, Westberg and Rhodes formed two corporations—Armor Real Estate Corporation and Armor Feed & Supply, Inc.—with Westberg and Rhodes as directors and shareholders. In November 2004, Armor Real Estate purchased the Rices Crossing property from Armor Products for $176,000.

*The Lawsuit*

This lawsuit originated on April 13, 2004, when Raley filed suit against Scott and Armor Products. By his suit, Raley sought to impose joint and several liability against Scott, individually, and Armor Products for a prior judgment that Raley had obtained against Patricia Scott d/b/a Armor Farm and Ranch Supply. Because it had a justiciable interest in the proceedings initially filed by Raley, MBCI intervened seeking to invalidate the transfers of property from CDS Erectors

6

& Rigging to Armor Products and from Armor Products to Armor Real Estate as fraudulent under the UFTA. In addition, seeking to enforce the prior judgment it had obtained against CDS Erectors & Rigging, MBCI asked the trial court to disregard the corporate form of CDS Erectors & Rigging and Armor Products as to Scott.[10] MBCI also sought to disregard the corporate form of Armor Real Estate.

By its claims, MBCI sought to impose liability for the original $61,026.39 debt against Scott, Armor Products, and Armor Real Estate based on its allegation of Rhodes's fraudulent conduct in signing the joint-check agreement. MBCI's first amended petition in intervention named only Scott, individually, Armor Products, and Armor Real Estate as defendants; it did not name Rhodes as a party to this suit in any capacity.

Raley settled his claims against Scott and Armor Products prior to trial. Thus, MBCI, Scott, Armor Products, and Armor Real Estate were the only parties who appeared and participated at trial.

### *Trial and Judgment*

After a bench trial, the trial court adjudged Scott and Armor Products to be jointly and severally liable to MBCI for the original debt of $61,026.39. The trial court found that the property transfer from CDS Erectors & Rigging to Armor Products violated the UFTA but the

---

[10] MBCI had previously sued CDS Erectors & Rigging and Rhodes for breach of contract, suit on a sworn account, fraud, and negligent misrepresentation. *MBCI v. CDS Erectors & Rigging, Inc.*, No. GN203730 (200th Dist. Ct., Travis County, Tex. Sept. 25, 2003). The trial court in that suit signed a default judgment against CDS Erectors & Rigging. *Id.* It is this default judgment that MBCI sought to enforce in the instant proceedings.

7

property transfer from Armor Products to Armor Real Estate did not. The trial court also awarded MBCI pre- and post-judgment interest and attorney's fees. Pursuant to Scott's and Armor Products' request, the trial court entered findings of fact and conclusions of law. MBCI appealed the trial court's judgment, and Scott and Armor Products filed a cross-appeal.

## ANALYSIS

### Standard of Review

On appeal, the parties raise various issues challenging the legal and factual sufficiency of the evidence to support the trial court's judgment. We review the trial court's conclusions of law *de novo* as legal questions. *State v. Heal*, 917 S.W.2d 6, 9 (Tex. 1996). The trial court's findings of fact have the same force and effect as a jury's verdict on questions and are reviewable for legal and factual sufficiency. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). When, as here, the appellate record includes a complete transcript of the trial court proceedings, the trial court's findings of fact are not conclusive, but subject to the same standards that govern legal and factual sufficiency challenges to jury findings. *Commission of Contracts of the Gen. Exec. Comm. of the Petroleum Workers Union v. Arriba, Ltd.*, 882 S.W.2d 576, 582 (Tex. App.—Houston [1st Dist.] 1994, no writ).

Our review of the legal sufficiency of the evidence is guided by the supreme court's decision in *City of Keller v. Wilson*, 168 S.W.3d 802 (Tex. 2005). In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the judgment, crediting favorable evidence if a reasonable fact-finder could, and disregarding contrary evidence unless a reasonable fact-finder could not. *Id.* at 807. The test for legal sufficiency is whether the evidence

8

would enable reasonable and fair-minded people to reach the judgment being reviewed. *Id*. at 827-28. In reviewing the factual sufficiency of the evidence, we consider and weigh all of the evidence in the record, and we may overturn a judgment only if it is so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Dyson v. Olin Corp.*, 692 S.W.2d 456, 457 (Tex. 1985) (citing *In re King's Estate*, 244 S.W.2d 660, 661 (Tex. 1951)).

We review the trial court's decision to award attorney's fees for abuse of discretion, and we review the amount awarded under a legal sufficiency standard. *Allison v. Fire Ins. Exch.*, 98 S.W.3d 227, 262 (Tex. App.—Austin 2002, pet. granted, judgm't vacated w.r.m.).

### *Questions Presented*

In three issues, MBCI complains that the trial court erred in failing to set aside the property transfer from Armor Products to Armor Real Estate, in failing to disregard Armor Real Estate's corporate form, and in failing to award MBCI the full amount of attorney's fees it requested. On cross-appeal, Scott and Armor Products raise eight issues that generally contend the trial court's judgment imposing personal liability against Scott violates article 2.21 of the Texas Business Corporation Act. *See* Tex. Bus. Corp. Act Ann. art. 2.21 (West 2003) (now Tex. Bus. Orgs. Code Ann. §§ 21.223-.226 (West Supp. 2006)).[11] Scott and Armor Products also contend the trial court erroneously invalidated the property transfer from CDS Erectors & Rigging to Armor Products,

---

[11] Article 2.21 of the Texas Business Corporation Act has been recodified in sections 21.223-.226 of the Texas Business Organizations Code. Act of May 13, 2003, 78th Leg., R.S., ch. 182, § 1, 2003 Tex. Gen. Laws 267, 427-28. For convenience, we cite to the current code.

improperly failed to give credit in its judgment against Scott and Armor Products for a $30,000 third-party settlement received by MBCI in satisfaction of the original $61,026.39 debt, and unlawfully awarded attorney's fees to MBCI despite MBCI's failure to segregate the reasonable and necessary fees to prosecute the instant suit.

### *Property Transfers and the UFTA*

We first turn to the parties' complaints regarding property transfers and the UFTA. MBCI complains that the trial court erred in failing to set aside the transfer of property from Armor Products to Armor Real Estate because Armor Real Estate failed to prove it was a good faith transferee, since one of Armor Real Estate's shareholders had actual knowledge of MBCI's claim before the transfer. On cross-appeal, Armor Products and Scott complain that the trial court erred in setting aside the original transfer of property from CDS Erectors & Rigging to Armor Products because there was no evidence, or in the alternative factually insufficient evidence, to establish that CDS Erectors & Rigging transferred property with the "actual intent to hinder, delay, or defraud" MBCI, as required under section 24.005(a)(1) of the UFTA. Armor Products and Scott further complain that the judgment cannot be supported under section 24.005(a)(2) or section 24.006 of the UFTA because MBCI failed to show that the debtor did not receive "reasonably equivalent value" for the property transferred.

#### 1. *CDS Erectors & Rigging Transfer to Armor Products*

The trial court concluded that the transfer of real property from CDS Erectors & Rigging to Armor Products violated sections 24.005(a)(1), 24.005(a)(2), and 24.006(a) of the UFTA. *See* Tex. Bus. & Com. Code Ann. §§ 24.005(a)(1)-(2), .006(a) (West 2002). The purpose of the

10

UFTA is to prevent debtors from defrauding creditors by transferring assets beyond their reach. *Mladenka v. Mladenka*, 130 S.W.3d 397, 404 (Tex. App.—Houston [14th Dist.] 2004, no pet.). The UFTA creates a statutory cause of action through which a creditor may seek recourse for a fraudulent transfer. *See Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 25 (Tex. App.—Tyler 2000, pet. denied); *Connell v. Connell*, 889 S.W.2d 534, 542 (Tex. App.—San Antonio 1994, writ denied) (act designed to prevent transfers of property made with intent to defraud creditors). The remedy afforded a successful creditor under the UFTA "relates entirely to the debtor's fraudulently transferred property and entails no personal liability on the part of those responsible for the transfer." *In re Mortgage America Corp.*, 714 F.2d 1266, 1272 (5th Cir. 1983) (citing *Cantwell v. Wilson*, 241 S.W.2d 366 (Tex. Civ. App.—Austin 1951, no writ)); *see also Mack v. Newton*, 737 F.2d 1343, 1361 (5th Cir. 1984).

### A.     Actual intent to hinder, delay or defraud

Section 24.005(a)(1) of the business and commerce code provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay, or defraud any creditor of the debtor . . . .

Tex. Bus. & Com. Code Ann. § 24.005(a)(1). Thus, a transfer is fraudulent under section 24.005(a)(1) if the debtor made the transfer with actual intent to hinder, delay, or defraud a creditor. *Id*.; *see also Mladenka*, 130 S.W.3d at 404.

A creditor seeking to set aside a transfer as fraudulent bears the burden of proving

by a preponderance of the evidence that the transfer was actuated by fraud. *Mladenka*, 130 S.W.3d at 405; *Ellis v. Ureste*, 159 S.W.2d 226, 227 (Tex. Civ. App.—San Antonio 1942, writ ref'd w.o.m.). Direct proof of fraud is often unavailable; therefore, a creditor may satisfy its burden of proving fraudulent intent with circumstantial evidence. *Mladenka*, 130 S.W.3d at 405 (citing *Roland v. United States*, 838 F.2d 1400, 1402-03 (5th Cir. 1988)). When determining actual intent under section 24.005(a)(1), we consider the nonexclusive factors, or "badges of fraud," identified in section 24.005(b) of the business and commerce code. *Id*. Among other things, these factors include whether the transfer was made to an insider; the debtor retained possession or control of the transferred property after the transfer; the transfer was concealed; the debtor had been sued or threatened with suit prior to the transfer; the property transferred was substantially all of the debtor's assets; the debtor absconded; the debtor removed or concealed assets; the value of consideration received by the debtor was reasonably equivalent to the asset's value; or the debtor was insolvent or became insolvent shortly after the transfer. Tex. Bus. & Com. Code Ann. § 24.005(b)(1)-(9). When several of these "badges of fraud" are present, a court may properly infer fraudulent intent. *Mladenka*, 130 S.W.3d at 405.

The trial court made the following finding of facts with respect to the transfer of real property from CDS Erectors & Rigging to Armor Products:

43. CDS executed the CDS Deed with the intent to hinder, delay, or defraud MBCI and other creditors because:

   a. The CDS Deed transferred the Real Property to an insider.

   b. CDS retained possession and control of the Real Property after it executed the CDS Deed.

12

c. Before CDS executed the CDS Deed, it ha[d] been sued or threatened with suit.

d. The Real Property was substantially all of CDS' assets.

e. CDS was presumed to be insolvent at the time or became insolvent shortly after it executed the CDS Deed.

f. CDS executed the CDS Deed shortly before or after it incurred a substantial debt.

44. CDS executed the CDS Deed without receiving reasonably equivalent value.

45. CDS was engaged in a business or transaction for which the remaining assets of CDS were unreasonably small in relation to the business or transaction or CDS executed the CDS Deed intending to incur, or reasonably should have believed it would incur, debts beyond its ability to pay as they came due.

In addition to these findings, the trial court concluded that the CDS Deed constituted a fraudulent transfer under sections 24.005(a)(1) and (2) of the Texas Business and Commerce Code.

Scott and Armor Products argue that the evidence is legally and factually insufficient to support these findings and conclusions. We disagree.

The evidence at trial established the presence of several "badges of fraud." First, CDS Erectors & Rigging transferred the property to insiders. If the debtor is a corporation, the UFTA defines an "insider" to include, among others, a director of the debtor, an officer of the debtor, a person in control of the debtor, or a relative of a general partner, director, officer or person in control of the debtor. Tex. Bus. & Com. Code Ann. § 24.002(7)(B) (West 2002). Because Utsey

13

and Bailey, the only two shareholders of Armor Products, were also officers and/or shareholders of CDS Erectors & Rigging, as well as Scott's relatives, both Utsey and Bailey satisfy the UFTA's definition of "insider." *See id*.

Second, the record demonstrates that MBCI threatened to sue CDS Erectors & Rigging prior to the transfer of real property from CDS Erectors & Rigging to Armor Products. MBCI's demand letter was dated December 20, 2001—at least eleven days before the property transfer was finalized. In the demand letter, MBCI stated that the CDS Erectors & Rigging account was past due in the amount of $65,397.62 and that MBCI "has made numerous attempts" to collect this past due amount. Both Rhodes and Scott were listed as officers of CDS Erectors & Rigging on the application,[12] and MBCI witness Deanna Page testified that she spoke with Rhodes on several occasions about the past due account and that he said only that he had not been paid on the Powell Lane Project. Page also testified that she made numerous calls to the telephone number listed on the credit application. This number was the same telephone number listed on the Wells Fargo bank account into which Rhodes deposited payments from the Powell Lane Project. Moreover, Scott admitted that this phone number was the correct number for CDS Erectors & Rigging although he denied receiving any calls or messages from MBCI at this number. Based on this evidence, we reject Scott's claim that CDS Erectors & Rigging was unaware of the MBCI debt prior to the property transfer.

---

[12] Although Scott and Rhodes testified that Rhodes was not an employee or officer of CDS Erectors & Rigging, Rhodes was listed on the MBCI credit application as the vice president of CDS Erectors & Rigging. Rhodes was also listed as the vice president of CDS Erectors & Rigging on the franchise tax reports for 1998 to 2000 on file with the secretary of state and comptroller.

Third, the evidence demonstrated that CDS Erectors & Rigging transferred substantially all of its assets. Scott testified on cross-examination at trial that, at the time of the transfer to Armor Products, CDS Erectors & Rigging was "in the hole . . . we had some equipment. We had a piece of property . . . that's about it." The record reflects that the 2001 tax return for CDS Erectors & Rigging showed a loss of $1,306, and the bank statement for CDS Erectors & Rigging showed a checking account balance of $10,407.44 as of the date of the transfer, December 31, 2001. Bailey's testimony revealed that Armor Products basically purchased three items from CDS Erectors & Rigging: the real property at issue; some small tools and equipment valued at approximately $3,000; and the ongoing work contracts. In addition to these three items, Armor Products assumed the $60,000 line of credit from Citizens State Bank. With regard to the major equipment, including three cranes and a forklift, used by CDS Erectors & Rigging in its steel erection business, Scott testified that the equipment belonged to him personally, and he retained ownership of the cranes and forklift after the transfer.

Finally, the evidence at trial gives rise to a presumption that CDS Erectors & Rigging was insolvent at the time of the transfer. Section 24.003 of the business and commerce code provides in relevant part:

> (a)    A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.
>
> (b)    A debtor who is generally not paying the debtor's debts as they become due is presumed to be insolvent.

*Id*. § 24.003(a)-(b) (West 2002).

15

Rhodes testified that he was supposed to receive $150,000 from the Powell Lane Project and that he did receive $51,333, but he never used any of that money to pay MBCI. When asked by MBCI's counsel what he understood the terms of the MBCI contract to be, Rhodes testified, "I knew I had to pay it back within, you know, I'm sure 30 days." When asked by MBCI's counsel if he ever received money on the Powell Lane Project, Rhodes testified:

A [Rhodes]: I got money several times.

Q [MBCI Counsel]: And you never took any of that money to pay for the materials with MBCI?

A [Rhodes]: I think I got 90 percent of that money before MBCI even delivered any materials out on that jobsite. This was - - I mean the sheets and trim are what was supplied by MBCI, maybe the purlins. I would have to go back and look, but that is - - I'm going to say 10 to 20 percent of the whole project costs, overall project costs.

Q [MBCI Counsel]: So it's your testimony that you got 90 percent of the money that Mr. Petrocelli and Mr. McCandless owed you before you ever ordered any materials from MBCI?

A [Rhodes]: No, I've got 90 percent of the money that they paid on this job, 80 to 90 percent of the money they paid. It wasn't the total amount that they owed me. It was still an agreement that they should pay for this material when it hit the ground . . . .

Q [MBCI Counsel]: And so when the money wasn't there when the material was delivered, you didn't reject it, did you?

A [Rhodes]: No.

Q [MBCI Counsel]: You let MBCI deliver the material.

A [Rhodes]: Right.

Q [MBCI Counsel]: And you accepted the material for the Powell Lane project?

16

A [Rhodes]: I didn't tell the guys to send it back or don't unload it, we needed it.

Q [MBCI Counsel]: And you are not going to deny that you received a number of phone calls from the credit department at MBCI with respect to payment of these invoices, right?

A [Rhodes]: I'm not going to deny that. No, that happened.

Because CDS Erectors & Rigging, at least through Rhodes, was aware of the MBCI debt and failed to pay when the debt was due, the trial court could properly presume that CDS Erectors & Rigging was insolvent within the meaning of the UFTA. *See id*. § 24.003(b).

Viewing the record as a whole, crediting favorable evidence if reasonable fact-finders could, and disregarding contrary evidence unless reasonable fact-finders could not, we find that reasonable and fair-minded people could have considered these badges of fraud and concluded that CDS Erectors & Rigging had the actual intent to hinder, delay, or defraud MBCI. Thus, we conclude that the evidence was legally sufficient to support the trial court's findings and conclusion that the transfer of real property from CDS Erectors & Rigging was a fraudulent transfer within the meaning of section 24.005(a)(1) of the business and commerce code. *See City of Keller*, 168 S.W.3d at 807, 827-28.

Likewise, upon consideration of all the evidence in the record, we cannot say that the trial court's findings and conclusions were so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176. The record reflects that CDS Erectors & Rigging, through Rhodes, was aware of the MBCI debt and failed to pay the debt when due. Moreover, Scott agreed that CDS Erectors & Rigging took no steps

17

to pay the MBCI debt when he was in the process of winding up CDS Erectors & Rigging's corporate affairs in early 2002, after he personally admitted to knowledge of the debt and the threat of suit by MBCI. Although Scott and Armor Products contend that CDS Erectors & Rigging was unaware of the debt until after Scott signed for the certified demand letter addressed to Rhodes on January 4, 2002, MBCI witness Page testified that she made numerous telephone calls and left several messages at the phone number listed on the credit application. Scott admitted that this number was the correct telephone number for CDS Erectors & Rigging, but he denied receiving any messages from or speaking to Page or anyone else with MBCI:

Q [MBCI Counsel]: Has your telephone number been 903-[XXX-XXXX]?

A [Scott]: Yes.

Q [MBCI Counsel]: And that is in fact your current telephone number?

A [Scott]: Yes.

Q [MBCI Counsel]: And isn't it true that MBCI had called you related to the sale of these materials that have been discussed here this morning?

Q [Scott]: To my knowledge, MBCI never called that . . . telephone number. And during the time they said they called every day, there was someone in the office nine hours a day, every day. I never received a message from MBCI on that number.

When MBCI asked about whether he received calls at the telephone number listed on the credit application, Scott testified:

Q [MBCI Counsel]: So if MBCI says that they called the phone number that is on the application for credit and left messages?

A [Scott]:                  They did not.

Q [MBCI Counsel]:  You would say that they are lying?

A [Scott]:                  Yes.

In addition to this testimony, the record reflects that the address and telephone number[13] on the Wells Fargo bank account into which Rhodes deposited the proceeds from the Powell Lane Project were Scott's home address and telephone number, even though Scott testified that Rhodes had never lived at that address.

In conducting our review of both the legal and factual sufficiency of the evidence, we are mindful that "[i]ntent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986); *see Logan v. Mullis*, 686 S.W.2d 605, 608 (Tex. 1985). The trial court, as fact-finder, was the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See City of Keller*, 168 S.W.3d at 819; *Ramco Oil & Gas, Ltd. v. Anglo Dutch (Tenge) L.L.C.*, 171 S.W.3d 905, 910 (Tex. App.—Houston [14th Dist.] 2005, no pet.). We may not substitute our judgment for the fact-finder's, even if we would reach a different answer on the evidence. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). Having reviewed the record, we hold the evidence was factually sufficient to support the trial court's findings and conclusion that the transfer from CDS Erectors & Rigging to Armor Products violates section 24.005(a)(1) of the business and commerce code.

---

[13] This was also the same telephone number listed on the credit application.

### B.      *"Reasonably equivalent value"*

Section 24.005(a)(2) of the business and commerce code provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A)      was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B)      intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Tex. Bus. & Com. Code Ann. § 24.005(a)(2). Section 24.006(a) provides:

(a)      A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

*Id*. § 24.006. Thus, to satisfy the requirements of either 24.005(a)(2) or 24.006(a), a creditor must prove that the debtor did not receive "reasonably equivalent value" in exchange for the asset transferred. *Id*. §§ 24.005(a)(2), .006(a).

The trial court invalidated the transfer of property from CDS Erectors & Rigging to Armor Products under both 24.005(a)(2) and 24.006. Scott and Armor Products challenge the trial court's findings and conclusion that CDS Erectors & Rigging did not receive "reasonably equivalent

20

value" for the transfer of real property to Armor Products on the ground that MBCI failed to offer evidence on the value of the property at the time of the transfer. Having determined that the evidence was legally and factually sufficient to support the trial court's findings that several "badges of fraud" were present and that MBCI satisfied its burden of proving actual intent to delay, hinder or defraud under section 24.005(a)(1), we do not reach the question of whether CDS Erectors & Rigging received "reasonably equivalent value" for the transfer of property to Armor Products. Therefore, we do not consider whether the transfer from CDS Erectors & Rigging to Armor Products was also fraudulent under sections 24.005(a)(2) or 24.006.

### 2. *Armor Products Transfer to Armor Real Estate*

We next turn to MBCI's complaint that the trial court erred in failing to set aside the transfer from Armor Products to Armor Real Estate as fraudulent under the UFTA. Having demonstrated that the transfer from CDS Erectors & Rigging was fraudulent, MBCI argues that the trial court was required to set aside all subsequent transfers of the property unless and until a party proves that it obtained the property in good faith and for value. We agree.

In relevant part, section 24.009 provides:

(a) A transfer or obligation is not voidable under Section 24.005(a)(1) of this code against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee.

(b) Except as otherwise provided in this section, to the extent a transfer is voidable in an action by a creditor under Section 24.008(a)(1) of this code, the creditor may recover judgment for the value of the asset transferred, as adjusted under Subsection (c) of this section, or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against:

21

(1)     the first transferee of the asset or the person for whose benefit the transfer was made; or

(2)     any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee.

*Id*. § 24.009(a)-(b) (West 2002).

To come within the protection of section 24.009, Armor Real Estate was required to prove that it took the property in good faith and for value. MBCI does not dispute that Armor Real Estate took the property for value. The record reflects that the property appraised for $150,000 in March 2003, and Armor Real Estate paid $176,000 to Armor Products when it purchased the property in November 2004. The question, therefore, is whether Armor Real Estate took the property in good faith within the meaning of section 24.009.

MBCI argues that the trial court erred in finding that Armor Real Estate took the property in good faith because Rhodes was an insider of the debtor; he was a shareholder and director of Armor Real Estate; and he had actual knowledge of the fraud against MBCI.[14] We construe MBCI's claim to challenge the legal and factual sufficiency of the trial court's finding that Armor Real Estate was a good faith transferee.

A creditor seeking to invalidate a prior conveyance by a judgment debtor must

---

[14] To the extent MBCI argues that Armor Real Estate waived the defense of good faith by failing to plead it as an affirmative defense, we disagree. Although the record reflects that Armor Real Estate did not plead good faith as an affirmative defense, *see* Tex. R. Civ. P. 94, MBCI did not object to the evidence or testimony presented by Armor Real Estate. Moreover, the record reflects that MBCI argued the issue of good faith in its trial brief and presented proposed findings of fact and conclusions of law on this issue to the trial court. Thus, we conclude the issue of good faith was tried by consent. *See* Tex. R. Civ. P. 67; *Southwestern Resolution Corp. v. Watson*, 964 S.W.2d 262, 264 (Tex. 1997).

22

demonstrate fraudulent intent on the part of the debtor. *Rucker v. Steelman*, 619 S.W.2d 5, 7 (Tex. Civ. App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.). In addition, where the evidence shows that a purchaser paid valuable consideration, a creditor must show that the purchaser had notice of the debtor's fraud. *Id*. (citing *Tillman v. Heller*, 14 S.W. 700 (Tex. 1890); *Hunter v. Pitcock*, 346 S.W.2d 509, 512 (Tex. Civ. App.—Fort Worth 1961, no writ)). Thus, having already demonstrated the fraudulent intent of the debtor, MBCI need only have shown that Armor Real Estate had actual or constructive knowledge of the fraud.

The record reflects that Rhodes was vice president of CDS Erectors & Rigging and that he was responsible for submitting the MBCI credit application. Although MBCI did not sue Rhodes when it intervened in this lawsuit, the record reflects that MBCI obtained a separate judgment against Rhodes for his failure to pay the debt owed to MBCI. The record further reflects that Rhodes was a 5% shareholder in Armor Real Estate, and the corporate documents of Armor Real Estate show that Rhodes was both a director and officer of the company.[15] Rhodes testified that he was aware of the debt owed to MBCI and that he failed to pay this debt. Additionally, in his original petition, Raley sued Patricia Scott d/b/a Armor Farm & Ranch Supply. The record reflects that Patricia Scott is Rhodes's mother and Scott's wife. Rhodes testified that his mother had taken out a "d/b/a" in the name "Armor Farm & Ranch Supply" to protect it. Rhodes further testified that he had either an ownership interest in or was an employee of several companies with "Armor" in their names, including Armor Enterprises, Armor Farm & Ranch Supply, Armor Steel Supply,[16]

---

[15] Rhodes was vice president and secretary of Armor Real Estate.

[16] Rhodes testified that Armor Steel Supply was a d/b/a for Armor Enterprises and that Armor Enterprises was also doing business as Armor Farm & Ranch.

23

Armor Real Estate, and Armor Feed & Supply.[17]  When asked how the names of these companies were chosen, Rhodes testified that he was the one who came up with the name "Armor" because he "like[d] doing metal buildings, and it was synonymous with protection."  Although Rhodes was no longer operating under the *d/b/a*s once he and Westberg purchased the property from Armor Products and formed Armor Real Estate and Armor Feed & Supply, Rhodes testified that he never changed the sign on the premises and, at the time of trial, the sign still read:  "Armor Enterprises," "Armor Steel Supply," and "Armor Farm & Ranch."

Viewing the evidence in the light most favorable to the verdict, we conclude that no reasonable fact-finder could disregard the evidence of Rhodes's knowledge of the fraud against MBCI.  *See City of Keller*, 168 S.W.3d at 807.  The evidence is clear that Rhodes was responsible for the debt owed to MBCI and that he failed to pay this debt.  To the extent that Rhodes was both an officer and director of Armor Real Estate, his knowledge of the fraud against MBCI is imputed to Armor Real Estate.  *See Poth v. Small, Craig, & Werkenthin, L.L.P.*, 967 S.W.2d 511, 515 (Tex. App.—Austin 1998, pet. denied) (knowledge held by corporate officers may be imputed to corporation itself).  That Westberg had no knowledge of the fraud does not allow Armor Real Estate to invoke the protections afforded a good faith transferee under section 24.009.  Because no reasonable fact-finder could have reached the conclusion that Armor Real Estate—through Rhodes—lacked knowledge of the fraud against MBCI, we hold the evidence was legally insufficient to support the trial court's judgment that Armor Real Estate was a good faith

---

[17]  Armor Real Estate and Armor Feed & Supply were the two corporations formed by Rhodes and Westberg.

24

transferee. *See City of Keller*, 168 S.W.3d at 827-28. We also hold that the trial court's finding that Armor Real Estate was a good faith transferee was against the great weight and preponderance of the evidence. *See id.* Accordingly, we sustain MBCI's claims that the trial court erred in failing to set aside the transfer from Armor Products to Armor Real Estate.

### *Personal Liability of Cecil Scott*

We next consider the question of Scott's personal liability. Scott argues that it was error for the trial court to find him personally liable for the judgment in favor of MBCI because (1) there are no findings of fact to support the judgment that Scott is individually liable; (2) there is no evidence to show that Scott committed actual fraud or received a direct personal benefit in connection with the transaction at issue between MBCI and CDS Erectors & Rigging; and (3) there is legally insufficient evidence to establish personal liability against Scott under article 2.21 of the Texas Business Corporation Act.

We construe Scott's arguments to challenge the trial court's conclusions of law 8 and 10, which provide:

> 8.    Scott is liable for any direct and consequential damages that MBCI has claimed.

* * *

> 10.    Scott is responsible for the Judgment.[18]

---

[18] We note that the term "Judgment" is defined by the trial court's findings of fact and conclusions of law to be the default judgment obtained July 21, 2003, by MBCI against CDS Erectors & Rigging in cause number GN203730. *See MBCI v. CDS Erectors & Rigging, Inc.*, No. GN203730 (200th Dist. Ct., Travis County, Tex. Sept. 25, 2003).

We review the trial court's conclusions of law *de novo*. *Heal*, 917 S.W.2d at 9.

Texas law precludes holding individual shareholders liable for corporate debts except in narrowly prescribed circumstances. *Willis v. Donnelly*, 199 S.W.3d 262, 271-72 (Tex. 2006). A shareholder "may not be held liable to the corporation or its obligees with respect to . . . any contractual obligation of the corporation . . . on the basis that the holder . . . is or was the alter ego of the corporation or on the basis of actual fraud or constructive fraud, a sham to perpetuate a fraud, or other similar theory." Tex. Bus. Orgs. Code Ann. § 21.223(a) (West Supp. 2006) (previously codified at Tex. Bus. Corp. Act Ann. art. 2.21(A) (West 2003)). Liability of a shareholder under section 21.223 "is exclusive and preempts any other liability imposed for that obligation under common law or otherwise." *Id*. § 21.224 (West Supp. 2006). The only exceptions to this rule are where the shareholder "caused the corporation to be used for the purpose of perpetuating and did perpetuate an actual fraud on the obligee primarily for the direct personal benefit of the shareholder," or where the shareholder "expressly . . . agrees to be personally liable to the obligee for the obligation." *Id*. §§ 21.223(b), .225(l) (West Supp. 2006).

At trial, MBCI argued that the court should pierce the corporate veil of CDS Erectors & Rigging and hold Scott individually liable for the default judgment that MBCI obtained against CDS Erectors & Rigging on July 21, 2003. *See Matthews Constr. Co. v. Rosen*, 796 S.W.2d 692, 694 (Tex. 1990) (allowing suit for individual shareholder liability to proceed on grounds of corporate alter ego as means of enforcing prior judgment obtained against now defunct corporation). MBCI also argued that the court should pierce the corporate veil of Armor Products to hold Scott individually liable for the debt owed to MBCI on the grounds that Armor Products was a mere tool or business conduit and, thus, the alter ego of Scott, Rhodes, and CDS Erectors & Rigging.

26

*See Hall v. Timmons*, 987 S.W.2d 245, 250 (Tex. App.—Beaumont 1999, no pet.). To pierce the corporate veil of either CDS Erectors & Rigging or Armor Products and find Scott individually liable, MBCI must demonstrate that Scott used the corporation to perpetuate an actual fraud against MBCI for his direct and personal benefit. *See* Tex. Bus. Orgs. Code Ann. § 21.223(b). This MBCI failed to do.

The trial court made no finding of fraud against Scott. Although we are not bound by the trial court's findings when the reporter's record is included in the record on appeal, MBCI proposed the following findings of fact:

75.     Rhodes, Scott, and CDS have a financial interest, ownership, or control for the acts of both Armor Products and Armor Real Estate.

76.     There is such unity between Rhodes, Scott, CDS, Armor Products, and Armor Real Estate that the separateness has ceased because:

   a.     The property of the respective corporations and individuals has not been kept separate.

   b.     Rhodes, Scott and CDS retain substantial financial interest, ownership, and control over the corporation.

   c.     Rhodes, Scott and CDS have used Armor Products and Armor Real Estate for their own purposes.

   d.     CDS, Armor Products, Armor Real Estate, Armor Enterprises, Armor Farm & Ranch Supply and Armor Feed & Supply, Inc. have common employees.

   e.     CDS, Armor Products, Armor Real Estate, Armor Enterprises, Armor Farm & Ranch Supply and Armor Feed & Supply, Inc. have common offices.

27

f.     CDS, Armor Products, Armor Real Estate, Armor Enterprises, Armor Farm & Ranch Supply and Armor Feed & Supply, Inc. have payment of expenses for the other respective entities.

g.     Armor Products, Armor Real Estate, Armor Enterprises, Armor Farm & Ranch Supply and Armor Feed & Supply, Inc. have common names.

h.     CDS, Armor Products, Armor Real Estate, Armor Enterprises, and Armor Feed & Supply, Inc. have undocumented transfers of funds between the entities.

i.     CDS, Armor Products, Armor Real Estate, Armor Enterprises, and Armor Feed & Supply, Inc. have unclear allocations of profits and losses between the entities.

77.    Rhodes, Scott and CDS have used Armor Products and Armor Real Estate for the purpose of perpetuating and did perpetuate an actual fraud involving dishonesty of purpose or intent to deceive MBCI primarily for the direct personal benefit of Scott and, his stepson, Rhodes.

78.    Scott and Rhodes used Armor Products and Armor Real Estate as a means of evading an existing legal obligation for the purpose of perpetuating and did perpetuate an actual fraud involving dishonesty of purpose or intent to deceive MBCI primarily for the direct personal benefit of Scott and Rhodes.

79.    CDS, Rhodes, Scott, Armor Products, and Armor Real Estate constitute a single business enterprise carrying on a common business objective.

The trial court rejected all of these findings proposed by MBCI. Where the trial court has been requested to make a particular finding in support of its judgment and fails to do so, that failure is tantamount to a refusal. *Vickery v. Commission for Lawyer Discipline*, 5 S.W.3d 241, 253 (Tex. App.—Houston [14th Dist.] 1999, pet. denied). Because the record reflects that MBCI drafted proposed findings of fact setting forth all of the elements of its recovery, and the trial court refused to adopt all of MBCI's proposed findings, we may not supply an omitted element by implication on

appeal. *Id.*; *see also* Tex. R. Civ. P. 299. We further conclude that the trial court's refusal to make the findings requested by MBCI is supported by the record. *See* Tex. R. Civ. P. 299.

Although the parties dispute whether Scott actually signed the MBCI credit application, the trial court found that Scott's signature was in his capacity as president of CDS Erectors & Rigging. There was no evidence that Scott agreed to be individually liable for the MBCI credit line. Moreover, the only fraud alleged by MBCI related to Rhodes's misrepresentations on the joint-check agreement. It was Rhodes, not Scott, who signed the joint-check agreement. The trial court made no finding of actual fraud on the part of Scott. Nor did the trial court find that Scott used CDS Erectors & Rigging or Armor Products to perpetuate a fraud against MBCI. Absent such findings, we hold the trial court erred in concluding that Scott is individually liable. *See* Tex. Bus. Orgs. Code Ann. § 21.223(a)(2); *Menetti v. Chavers*, 974 S.W.2d 168, 173 (Tex. App.—San Antonio 1998, no pet.).[19]

### *Piercing the Corporate Veil of Armor Real Estate*

On appeal, MBCI argues that the trial court erred in failing to pierce the corporate veil of Armor Real Estate. MBCI contends that the trial court should have pierced the corporate veil of Armor Real Estate on grounds of alter ego and single business enterprise. We disagree.

The trial court drew the following legal conclusions with regard to MBCI's claims against Armor Real Estate:

---

[19] To the extent the trial court found that Armor Products was a mere business conduit of CDS Erectors & Rigging, this finding does not support individual liability against Scott. Rather, it goes only to the trial court's judgment that Armor Products was liable under the theory that it was the "alter ego" of CDS Erectors & Rigging.

29

2.      A[rmor Real Estate] is not the alt[e]r ego of CDS [Erectors & Rigging].

3.      A[rmor Real Estate] is not the alter ego of A[rmor Products].

4.      CDS [Erectors & Rigging] and A[rmor Real Estate] are not a single business enterprise.

5.      A[rmor Products] and A[rmor Real Estate] are not a single business enterprise.

We review the trial court's conclusions of law *de novo*. *Heal*, 917 S.W.2d at 9.

The record reflects that Armor Real Estate was incorporated by Lester Westberg for the purpose of holding title to the property acquired from Armor Products. The record also reflects that Westberg was the president of Armor Real Estate and held 95% of the stock in Armor Real Estate. Rhodes was the vice president and secretary of Armor Real Estate and held 5% of its stock. Neither Westberg nor Rhodes held stock in Armor Products or CDS Erectors & Rigging.

The alter ego doctrine provides one way by which a creditor can pierce the corporate veil to reach a shareholder's assets. *Western Horizontal Drilling, Inc. v. Jonet Energy Corp.*, 11 F.3d 65, 68 (5th Cir. 1994); *see also Fidelity & Deposit Co. v. Commercial Cas. Consultants, Inc.*, 972 F.2d 272, 274 (5th Cir. 1992) ("alter ego" is but one form of corporate disregard in Texas). Single business enterprise is another form of corporate disregard in Texas. *Coleman v. Klöckner & Co. AG*, 180 S.W.3d 577, 586 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Merely adducing evidence that Armor Real Estate is the alter ego of one of its shareholders is not enough; to pierce the corporate veil of Armor Real Estate on the grounds of alter ego or single business enterprise, MBCI was required to prove that Westberg or Rhodes committed actual fraud against MBCI for his direct

personal benefit.[20]  *See* Tex. Bus. Orgs. Code Ann. § 21.223; *Atlantic Richfield Co. v. Long Trusts*, 860 S.W.2d 439, 446 (Tex. App.—Texarkana 1993, writ denied); *Farr v. Sun World Sav. Ass'n*, 810 S.W.2d 294, 296 (Tex. App.—El Paso 1991, no writ) ("Where actual fraud primarily for the benefit of the perpetrating shareholder or shareholders can be shown, the various doctrines for disregarding the corporate entity, including alter ego and a sham to perpetrate a fraud, are still very much alive.").  This MBCI did not do.

The actual fraud component in section 21.223 concerns "shareholder liability for *acts of the corporation in connection with contract claims*." *Farr*, 810 S.W.2d at 296 (emphasis added).  MBCI was required to prove fraud in connection with those acts. *See id*. at 297; *see also Atlantic Richfield Co.*, 860 S.W.2d at 446 (imposing liability where fraud was shown in relation to transactions at issue in case).  Armor Real Estate was never a customer of MBCI and had no corporate dealings with MBCI.  Armor Real Estate owed no obligation to MBCI, contractual or otherwise.  Moreover, the only fraud alleged by MBCI was in relation to Rhodes's signature on the joint-check agreement on behalf of CDS Erectors & Rigging.  MBCI made no allegation of fraud against Westberg or Rhodes in connection with Armor Real Estate. *See Thrift v. Hubbard*, 44 F.3d 348, 354 (5th Cir. 1995) (refusing to pierce corporate veil on grounds of alter ego where fraud was

---

[20]  We reject MBCI's contention that it need only prove constructive fraud to pierce the corporate veil of Armor Real Estate. Section 21.223(a)(2) of the Texas Business Organizations Code states that a shareholder may not be held liable for the contractual obligations of a corporation on the basis that the shareholder was the "alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory." Tex. Bus. Orgs. Code Ann. § 21.223(a)(2).  The only exception is where an obligee, like MBCI, demonstrates that the shareholder committed actual fraud for his direct and personal benefit. *See id*. § 21.223(b). Because MBCI seeks to impose liability for a contractual obligation, it must demonstrate actual fraud to pierce the corporate veil of Armor Real Estate. *Id*.

31

not shown in connection with transaction at issue).  MBCI alleged only that Rhodes committed

fraud in connection with his signature on the joint-check agreement on behalf of CDS Erectors &

Rigging.  Accordingly, on this record, there is no basis on which MBCI can pierce the corporate veil

of Armor Real Estate.  *See* Tex. Bus. Orgs. Code Ann. § 21.223.

***Attorney's Fees***

MBCI, Scott, and Armor Products appeal the trial court's award of attorney's fees.

MBCI argues that the trial court erred in failing to award the full amount of attorney's fees sought

by MBCI.  Scott and Armor Products argue that the trial court erred in awarding any attorney's fees

to MBCI because MBCI was required to segregate its request for attorney's fees and failed to do so.

MBCI sought recovery of its attorney's fees under section 24.013 of the UFTA and

section 37.009 of the Texas Civil Practice and Remedies Code.  Each of these provisions gives the

trial court discretion to award reasonable and necessary attorney's fees as are equitable and just.

Tex. Bus. & Com. Code Ann. § 24.013 (West Supp. 2006); Tex. Civ. Prac. & Rem. Code Ann.

§ 37.009 (West 1997).  We review the trial court's award of attorney's fees for abuse of discretion,

and we review the amount awarded for legal sufficiency.  *See Allison*, 98 S.W.3d at 262.  A district

court abuses its discretion if it acts without reference to any guiding principles.  *Downer v.*

*Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).  To determine whether a

district court abused its discretion, we consider whether the district court's action was arbitrary or

unreasonable.  *Id*. at 242.  Because we review the amount of attorney's fees awarded under a

legal sufficiency review, we must view the evidence in a light that tends to support the disputed

finding and disregard evidence and inferences to the contrary. *City of Keller*, 168 S.W.3d at 807.

If more than a scintilla of evidence supports the challenged finding, the legal sufficiency

challenge must fail. *Id.*

A party seeking to recover attorney's fees under section 24.013 of the UFTA or

section 37.009 of the civil practice and remedies code must demonstrate that the fees it seeks are

reasonable. Tex. Bus. & Com. Code Ann. § 24.013; Tex. Civ. Prac. & Rem. Code Ann. § 37.009.

When determining the reasonableness of a request for attorney's fees, a trial court must consider

those factors identified by the supreme court in *Arthur Andersen & Co. v. Perry Equipment Corp.*,

945 S.W.2d 812, 818 (Tex. 1997). These factors include:

(1)     the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;

(2)     the likelihood . . . that the acceptance of the particular employment will preclude other employment by the lawyer;

(3)     the fee customarily charged in the locality for similar legal services;

(4)     the amount involved and the results obtained;

(5)     the time limitations imposed by the client or by the circumstances;

(6)     the nature and length of the professional relationship with the client;

(7)     the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8)     whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

33

*Id*. Additionally, a party must show that the fees it seeks were incurred while suing a defendant to be charged with the fees on a claim that permits recovery of attorney's fees. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex. 1991). In a case involving multiple claims against multiple defendants, some of whom are no longer parties to the litigation, Texas law requires a party seeking recovery of attorney's fees to segregate the fees owed by the remaining defendants from those owed by the settling defendants, so the remaining defendants are not charged with fees that they do not owe. *Id*. at 10-11. The only exception to the requirement to segregate fees is where "the attorney's fees incurred are in connection with claims arising out of the same transaction and are so interrelated that their 'prosecution or defense entails proof or denial of essentially the same facts.'" *Id*. at 11.

Here, MBCI requested attorney's fees in the amount of $97,306. In support of this request, MBCI submitted fee statements for July 2002 through the date of trial in March 2005; MBCI intervened in these proceedings in October 2004. MBCI's counsel testified that MBCI's request for $97,306 in attorney's fees was reasonable, but there was contrary testimony from Scott and Armor Products' expert witness on attorney's fees that $97,306 was unreasonable. Counsel for MBCI further testified that it was requesting attorney's fees for the "entire file" because this case was "really about five lawsuits rolled into one." Although MBCI pursued separate lawsuits and obtained various judgments against CDS Erectors & Rigging, Marc Cook, Jason Rhodes, and Commercial Indemnity Insurance Company and/or settlements with the Powell Lane Plaza Partnership, Joe Petrocelli, and Mark McCandless, MBCI's counsel testified on cross-examination that it had not segregated its request for attorney's fees among these various parties. In addition, counsel for MBCI conceded that it was unnecessary for MBCI to obtain judgments against all of these parties in order

34

to pursue its claims against Scott and Armor Products under the UFTA. The lawsuits were indeed interrelated and complex. But, based on this evidence and testimony, we conclude it was necessary for MBCI to segregate in some manner its request for attorney's fees. *See id*. at 10.

Although the record reflects the trial court requested that MBCI segregate its fees, MBCI gave conflicting evidence regarding segregation. At trial, counsel for MBCI testified that the trial court could identify and segregate attorney's fees based on the fee statements and invoices submitted by MBCI because the court could review each entry to determine which fees to award. The following colloquy occurred between the court and MBCI's counsel:

> Q [Court]: Is there any way I can find from the evidence in this record how to segregate those items?
>
> A [MBCI Counsel]: I believe you can, Your Honor.
>
> Q [Court]: Tell me how.
>
> A [MBCI Counsel]: The entries are detailed. They say what we did. I think you could take — if you adopted what Mr. Dietz said, the last two months of bills have only been for this case.
>
> Q [Court]: And what do the last two months of bills total to?
>
> A [MBCI Counsel]: $57,000, and that was before trial.

After trial, the trial court again requested MBCI to segregate its attorney's fees, and MBCI submitted a letter requesting $70,408 in attorney's fees. There is nothing in the record that reveals how the trial court then arrived at the awarded amount of $14,192 in attorney's fees. We are unable to determine how the trial court applied the *Andersen* factors, nor can we evaluate the trial court's segregation analysis. Without providing any analysis or reference to guiding principles, we

35

are unable to review the amount awarded for legal sufficiency or determine whether the trial court abused its discretion in its award of attorney's fees. *See Barker v. Eckman,* 2006 Tex. LEXIS 1187, at *16 (Tex. Nov. 17, 2006) (holding litigants are entitled to "meaningful evidentiary review" of attorney's fee award); *Allison*, 98 S.W.3d at 262; *Downer*, 701 S.W.2d at 241-42. Accordingly, we reverse the trial court's award of attorney's fees and remand for further proceedings.

### *Settlement Credit*

Finally, Scott and Armor Products complain that the trial court erred in failing to credit against the judgment $30,000 in settlement proceeds received by MBCI from the Powell Lane Plaza Partnership, Joe Petrocelli, and Mark McCandless (collectively "the Powell Lane parties"). Relying on the supreme court's holding in *Stewart Title Guaranty Co. v. Sterling*, 822 S.W.2d at 8, Scott and Armor Products argue that the "one satisfaction rule" required the trial court to credit the $30,000 received by MBCI from the Powell Lane parties in its judgment here. MBCI counters that the "one satisfaction rule" only applies in tort cases, and this case arises from a breach of contract; therefore, MBCI argues that Scott and Armor Products are not entitled to a settlement credit as a matter of law. MBCI further argues that, even if the one satisfaction rule applies, section 33.011(5) of the civil practice and remedies code bars Scott and Armor Products from

receiving a settlement credit because MBCI did not receive any settlement proceeds until after trial.[21]

*See* Tex. Civ. Prac. & Rem. Code Ann. § 33.011(5) (West 1997 & Supp. 2006).

We review the trial court's decision to apply a settlement credit for an abuse of discretion. *Oyster Creek Fin. Corp. v. Richwood Invs. II, Inc.*, 176 S.W.3d 307, 326 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (citing *Utts v. Short*, 81 S.W.2d 822, 829 (Tex. 2002); *Texas Capital Sec. Inc. v. Sandefer*, 108 S.W.3d 923, 925 (Tex. App.—Texarkana 2003, pet. denied)).  A trial court abuses its discretion when it acts without reference to guiding rules or principles.  *Downer*, 701 S.W.2d at 241-42.

Although the record reflects that MBCI sued multiple defendants in various proceedings to collect the amount owed on the CDS Erectors & Rigging line of credit account, it is undisputed that MBCI suffered only one injury as a result of the Powell Lane parties' failure to pay Rhodes, who in turn failed to pay MBCI.  We agree with Scott and Armor Products that the one atisfaction rule prevents MBCI from recovering twice for a single injury.[22]  *See Crown Life Ins. Co.*

---

[21] As a practical matter, we note that the legislature amended section 33.011(5) of the civil practice and remedies code in 2003, *see* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 4.05, 2003 Tex. Gen. Laws 847, 856 (now codified at Tex. Civ. Prac. & Rem. Code Ann. § 33.011(5) (West Supp. 2006)), and that MBCI's argument relies on the previous version of this statute. However, given our disposition of the settlement credit issue, we express no opinion on the merits of MBCI's argument.

[22] The one satisfaction rule is consistent with principles of contract law, which preclude a non-breaching party from recovering damages for breach of contract that would put the non-breaching party in a better position than if the contract had been performed. *See Miga v. Jensen*, 96 S.W.3d 207, 216 (Tex. 2002); *Quinney Elec., Inc. v. Kondos Entm't, Inc.*, 988 S.W.2d 212, 214 (Tex. 1999).  Likewise, this rule is consistent with section 24.008 of the UFTA, which precludes MBCI from recovering damages in excess of its claim.  *See* Tex. Bus. & Com. Code Ann. § 24.008(a)(1) (West 2002) (providing that "a creditor . . . may obtain . . . avoidance of the transfer or obligation *to the extent necessary to satisfy the creditor's claim*") (emphasis added).

*v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000); *Oyster Creek*, 176 S.W.3d at 326-27. This rule applies in cases where multiple defendants commit the same act or technically different acts that result in a single injury to the plaintiff. *Crown Life*, 22 S.W.3d at 390. Moreover, contrary to MBCI's argument, the one satisfaction rule applies even in the absence of tort liability. *See Oyster Creek*, 176 S.W.3d at 327 (citing *El Paso Natural Gas Co. v. Berryman*, 858 S.W.2d 362, 364 (Tex. 1993)).

To the extent Scott and Armor Products seek a settlement credit, they have the burden of proving the right to such a credit. *See Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 927 (Tex. 1998); *Oyster Creek*, 176 S.W.3d at 327. This includes proving the amount of the settlement received by MBCI. *See Mobil Oil*, 968 S.W.2d at 927. Scott and Armor Products can meet this burden of proof by introducing the settlement agreement or some evidence of the settlement amount received by MBCI in the record. *Id.* Once a nonsettling defendant introduces evidence of a settlement agreement or settlement amount in the record, the trial court must presume that the settlement credit applies unless the nonsettling plaintiff presents evidence to overcome the presumption. *Utts*, 81 S.W.3d at 829. Stated differently, if Scott and Armor Products meet their burden of proving that MBCI benefitted from a settlement by introducing evidence of the settlement agreement or amount in the record, then the burden shifts to MBCI to produce evidence allocating the settlement between (1) damages for which the Scott, Armor Products and the Powell Lane parties are jointly liable and (2) damages for which only the Powell Lane parties were liable. *See Crown Life*, 22 S.W.3d at 392.

Because the record reflects that Scott and Armor Products introduced a copy of the settlement agreement between MBCI and the Powell Lane parties into evidence, we conclude that

Scott and Armor Products met their burden of proving the right to a settlement credit. *See Mobil Oil*, 968 S.W.2d at 927. Accordingly, the burden shifted to MBCI to allocate the settlement proceeds between damages for which Scott, Armor Products and the Powell Lane parties were jointly liable and damages for which only the Powell Lane parties were liable. *See Crown Life*, 22 S.W.3d at 392. Although the record reflects that MBCI attempted to meet its burden to allocate damages in its "Amended Motion to Enter Judgment," there is nothing in the record that reflects the trial court's consideration of either the settlement amount or MBCI's attempted allocation of damages between Scott, Armor Products and the Powell Lane parties. Without providing any analysis or reference to guiding principles, we are unable to determine whether the trial court abused its discretion in failing to apply a settlement credit in its judgment. *See Downer*, 701 S.W.2d at 241-42. For this reason, we remand the issue of application of a settlement credit to the trial court for further proceedings.

## CONCLUSION

Having considered the parties' various issues on appeal, we affirm the trial court's judgment that the transfer of property from CDS Erectors & Rigging to Armor Products violated section 24.005 of the UFTA. We reverse the trial court's judgment that Armor Real Estate took the property in good faith, and we conclude that the transfer of property from Armor Products to Armor Real Estate should be set aside as fraudulent under the UFTA. We also reverse the trial court's judgment of joint and several liability against Scott individually. We affirm the trial court's refusal to pierce the corporate veil of Armor Real Estate. Finally, we reverse the trial court's award of attorney's fees, and we reverse the trial court's judgment regarding the settlement credit. We

remand this cause to the trial court for further proceedings on the issues of attorney's fees and application of a settlement credit consistent with this opinion.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed in part; Reversed and Rendered in part; Reversed and Remanded in part

Filed:   January 10, 2007